UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-61113-Civ-ZLOCH/Snow

LEAH A. KORITZKY,

    Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on the plaintiff's complaint seeking judicial review of a final decision of the Social Security Administration denying the plaintiff's application for disability benefits. The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et. seq., and was referred to United States Magistrate Judge Lurana S. Snow for report and recommendation.

## I. PROCEDURAL HISTORY

The plaintiff filed an application for disability benefits on April 19, 2004, alleging disability since October 1, 2003, as a result of breast cancer and depression. The application was denied initially and upon reconsideration. The plaintiff then requested a hearing which was held before Administrative Law Judge M. Dwight Evans on November 15, 2004. The Administrative Law Judge found that the plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied the plaintiff's

request for review on June 8, 2007. The plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

On the date of the hearing, the plaintiff was 51 years old, with a high school diploma and a year and a half of college. (R:354) Her previous employment was as a sales representative for a pest control company, and a sales representative for an insurance company. (R:61)

The medical record reveals that the plaintiff underwent mammograms on March 5, 1999, and January 24, 2000, followed by an ultrasound examination of her left breast on February 22, 2000, and another mammogram on March 17, 2000, which showed left and right sided nodules which appeared benign. (R:94-103) The mammogram of August 28, 2003, showed a nodular density in the left breast which had increased in size from the prior mammograms. (R:144)

On October 13, 2003, Dr. Mona Beth Wolpe, who had treated the plaintiff since March 2000, referred the plaintiff for a lumpectomy. (R:128) The surgery, including excision of the sentinel lymph node, was performed by Lee Porterfield, M.D., on October 16, 2002. (R:171) On October 27, 2003, Dr. Porterfield subsequently performed a left axillary node dissection. (R:172-73) The October 28, 2003, pathology report found one of the twenty lymph nodes positive for microscopic focus of metastatic carcinoma. (R:176)

Dr. Wolpe referred the plaintiff to Eyal Meiri, M.D., an oncologist, who saw the plaintiff on November 17, 2003, and discussed the chemotherapy treatment options. Dr. Meiri recommended Anthracycline and a taxane-based drug. The plaintiff stated that she understood the options explained to her, but intended to get a second opinion. (R:201-204) The plaintiff returned to Dr. Meiri on November 24, 2003, and reported that she had a consultation with Dr. Peter Radice, who made recommendations similar to those proposed by Dr. Meiri, but who also discussed participating in a drug trial of AC, to be followed by Taxol with or without Receptin. The plaintiff did not want to participate in a drug trial, but asked if she could receive the same drugs from Dr. Meiri without the drug trial protocol. While the drug was available to Dr. Meiri, the issue was whether the plaintiff's insurance would pay for it. The plaintiff and Dr. Meiri decided on a regimen of AC followed by Taxotere. (R:200)

The plaintiff continued to see Dr. Meiri from December 17, 2003, to July 9, 2004. Dr. Meiri first adjusted the plaintiff's medication to combat nausea and vomiting, which had resulted in her hospitalization for 36 hours. (R:209-215) In February 2004 the plaintiff decided not to continue with the Taxane adjuvant program, owing to the potential toxicities. A different regimen was instituted. In March 2004, the plaintiff decided to discontinue chemotherapy, fearing cardiac complications when her MUGA scan

showed some change, although still within normal limits. Dr. Meiri noted that the plaintiff's only remaining symptom was fatigue, which did not interfere with her golf game or her daily activities. Dr. Meiri arranged for radiation therapy, but left the plaintiff's drug port in place until the radiation therapy was complete. The plaintiff's April 2004 mammogram was unremarkable, and by July 2004, Dr. Meiri scheduled follow up visits at three-month intervals. (R:191-199) The radiation treatment was administered by Bruce D. Green, M.D., from April 12 through May 28, 2004. (R:216-220) The drug port was removed July 2, 2004. (R:342)

On April 27, 2004, the plaintiff completed a form detailing her activities of daily living. She stated that she prepared her own breakfast and dinner, mainly cereal and microwave dinners, she did her own shopping and, when she could, her laundry. She did not vacuum or clean. She was able to manage her own money. She did not socialize with friends as much as she used to because her friends couldn't handle her cancer, but she did socialize with her family. She went to church less frequently. Her golf game had been limited. She felt that her mental capacity had decreased since the chemotherapy, and she became tired more easily. She sometimes felt depressed, which interfered with her ability to get along with the public. (R:74-77)

A Residual Functional Capacity Assessment was completed by an agency physician, Dr. Edward Holifield, on May 14, 2004. The

4

report stated that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently. She could sit for six hours per 8-hour workday, and could stand or walk for six hours per workday. She had unlimited ability to use hand and foot controls, with no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations and no environmental limitations. (R:229-236)

On June 28, 2004, Jay Weinstein, Ph.D., performed a consultative psychological evaluation of the plaintiff. Dr. Weinstein noted that the plaintiff took Valium and thyroid medicine, and had weekly therapy sessions. There was no sign of psychosis or thought disorder, but she had impaired attention and borderline concentration. Her abstract reasoning and cognition were intact, but her ability to perform simple computations was impaired. She was able to handle all activities of daily living, including driving, and managing her own finances. Dr. Weinstein diagnosed major depressive disorder, recurrent, mild and deferred. (R:237-38)

On July 20, 2004, Angela Register, Ph.D., completed a Psychiatric Review Technique Form, based on the plaintiff's medical records. Dr. Register found that the plaintiff had a not-severe impairment of affective disorder, whose symptoms did not precisely satisfy the diagnostic criteria, but constituted mild depression. There was a mild limitation of her activities of daily living, her social functioning and her ability to maintain concentration,

persistence or pace, and there were no episodes of decompensation. Dr. Register found that the plaintiff's symptoms were consistent with mild depression, and discounted the diagnosis of major depression as inconsistent with the clinical presentation. Dr. Register found that the plaintiff's functioning was mainly limited by her physical problems, rather than by her mild depression. (R:253-266)

On August 20, 2004, Charles Finkbeiner, M.D., performed a nerve conduction study to evaluate upper and lower extremity symptoms. He concluded that in the upper extremity there was a low sensory amplitude in the right median nerve, a non-specific finding of axonal loss. In the lower extremity, the was moderate right S1 radiculopathy, but no left lumbrosacral radiculopathy. (R:285-87).

On September 10, 2004, Angela Register, Ph.D., completed a second Psychiatric Review Technique Form, based on the plaintiff's medical records. Dr. Register concluded that the plaintiff had a not severe impairment of affective disorder which did not precisely meet the diagnostic criteria for the disorder, but constituted mild depression. There was no limitation her activities of daily living, her social functioning or her ability to maintain concentration, persistence or pace, and there were no episodes of decompensation. Dr. Register's notes stated that the plaintiff had mild depression and mild cognitive problems but had normal functioning, with no documented basis for restrictions. (R:239-252)

6

The plaintiff had a follow-up visit with Dr. Meiri on October 7, 2004. Dr. Meiri noted that the plaintiff's fatigue may be a residual from chemotherapy, but that the plaintiff's severe pain in her lower right extremity was likely the result of factors other than her cancer or chemotherapy. (R:307)

On December 13, 2004, the plaintiff was examined by Marla Dudak, M.D., who found no evidence of breast cancer, and a mild decrease in range of motion on her left side. (R:278-280 and 340) The plaintiff continued to see Dr. Meiri from January 5, 2005, to August 29, 2005. On January 5, the plaintiff reported that she was experiencing cough, sore throat and general malaise because her home became moldy [after Hurricane Wilma in October 2005]; she had moved to an apartment. Dr. Meiri recommended she follow the treatment prescribed by Dr. Wolpe. The plaintiff returned on January 10, and received the same advice. Dr. Meiri noted that the latest mammogram was negative and told the plaintiff to return in four months. Dr. Meiri found that the plaintiff was doing well, except for some discomfort in her right hip which showed only negative results on radiographs and MRI scans. Dr. Meiri thought the pain was from the plaintiff's past extensive exercise programs and her golf, and told her to seek treatment from Dr. Wolpe. The plaintiff reported that she was working part time. Dr. Meiri ordered an additional mammogram and told the plaintiff to return in six months. The plaintiff returned on August 29, 2005, with no physical complaints.

7

She stated that routine lab work had showed liver problems including possible Hepatitis-C, but that further testing revealed this to be a false positive. (R:288-294)

On June 1, 2005, the plaintiff saw Dr. Wolpe for knee pain after she lost her footing while playing golf. (R:270) She returned on September 23, 2005, for a prescription for a mammogram. She reported that she was taking glucosamine for joint pain and was teaching water aerobics. (R:269) In December 2005, Dr. Wolpe treated the plaintiff for a sore throat, fever, chills and a cough. (R:267-68)

A diagnostic mammogram taken September 30, 2005, showed no evidence of malignancy. (R:281-284) On October 19, 2005, Dr. Wolpe prescribed physical therapy for pain in the plaintiff's hip. (R:299) At the initial evaluation, the plaintiff stated that the pain had begun two to three months prior and had worsened over time, with no cause other than "old age, I guess." She continued to teach water aerobics. A four week physical therapy program was set up with two to three sessions per week. (R:296-300) The plaintiff was discharged from therapy for non-compliance because she only attended three therapy sessions, cancelled her last two appointments because she felt ill, and did not return for further therapy. (R:295-303)

The plaintiff returned to Dr. Meiri on April 6, 2006, for a follow-up visit. She had recently visited Dr. Dudak, and now wished to discuss further Herceptin chemotherapy with Dr. Meiri.

Dr. Meiri noted that certain lab tests were required before considering further chemotherapy. (R:304) After discussing the issue with Dr. Dudak, Dr. Meiri told the plaintiff that there was no data to suggest that Herceptin therapy two years after the prior chemotherapy and radiation therapy would be of value, that certain medical considerations suggested that Herceptin therapy might be risky owing to other medical factors in the plaintiff's history, and that the plaintiff should carefully consider whether she wanted to pursue this therapy. Dr. Meiri noted that other physicians offered such delayed therapy and that she would be willing to offer it if the plaintiff decided to pursue it. (R:341)

Dr. Meiri completed a medical Assessment of Ability to do Work-Related Activities Form on June 15, 2006. Dr. Meiri found that the plaintiff's chronic right hip pain affected her ability to lift and carry, and limited her to frequent lifting of 10 pounds per eight-hour workday. Her hip pain also limited her walking to one-half hour or one hour per work day. Her back pain limited her ability to sit to one half to one hour per work day. She could balance frequently, never crouch, and could occasionally climb, stoop, kneel and crawl. She had no impairments for handling, feeling, hearing and speaking, but had limited ability to reach and push/pull with her left arm, as a result of her breast surgery. She had no restriction on heights or temperature extremes, but was limited with regard to moving machinery owing to her other

9

limitations, to noise owing to her tinnitus, and had limitations with regard to chemicals, dust, fumes, humidity and vibration. Dr. Meiri noted that the plaintiff also had severe chronic fatigue. She described the plaintiff's hip pain and neuropathy as severe. She concluded that the plaintiff was not capable of performing sedentary work or light work. (R:335-339)

At the hearing, the plaintiff testified that she stopped working in late September or early October 2003, immediately after being diagnosed with breast cancer. The only work she was able to perform now is to teach water aerobics one or two hours per week. (R:355) She described the sequence of chemotherapy and radiation therapy, and stated that the chemotherapy left her with fatigue and neuropathy in her right foot, affecting three toes. She has problems with her hip, which began after her radiation therapy, and has back problems from a herniated disc at L4-L5 from an automobile accident. (R:357-58)

The plaintiff stated that she was considering a one-year course of Herceptin chemotherapy, which she previously declined to add to her chemotherapy, fearing side effects from taking the drugs together. She felt it was safer taken by itself. She had delayed starting the therapy since she was living with a friend owing to hurricane damage to her home, and did not want to inconvenience the friend with the home health care which may accompany the chemotherapy. (R:361)

The plaintiff testified that her fatigue started an hour or two after she gets up. She sleeps for up to two hours each afternoon and eight hours at night. (R:362) No particular activity triggered the fatigue. (R:364-65) She also had short term memory problems. She believed that both of these problems were caused by the chemotherapy and radiation therapy. (R:365)

The plaintiff took thyroid medication daily, along with several over the counter medications such as Sam-E, multivitamins and coenzyme Q10. She took Valium when she needed it, perhaps one a week.

When asked why she could not work, the plaintiff stated that her fatigue and pain in her hip and back prevented her from performing even office work. (R:365-66)

### III. DECISION OF THE ALJ

The Administrative Law Judge ("ALJ") found that the plaintiff had the severe impairment of breast cancer. But he found that her impairment of depression was not severe since she had not undergone psychiatric or psychological treatment for any extended period of time. After reviewing Dr. Weinstein's mental evaluation, the ALJ found that the diagnosis of severe depression was inconsistent with the plaintiff's presentation, medical records and statements of her activities of daily living. Accordingly, the ALJ found that the plaintiff did not have an impairment or combination

of impairments that meets or medically equals on of the listed impairments in 20 CFR Part 404, Subpart B, Appendix 1.

Next the ALJ considered whether the plaintiff had the residual functional capacity to perform the full range of light work. He noted that the plaintiff had not completed the course of physical therapy for the pain in her right hip. The plaintiff testified that she could not work because she was fatigued, requiring a daily nap, suffered from back pain and hip pain, and took over the counter medication for depression. But the records shows that she was able to handle all of the activities of daily living, including driving and managing her own funds. She performed household chores such as laundry and cooking, and was able to take care of her personal needs. She had the ability to live at home, shop, visit relatives, and go to church, where she was active in a church group. The ALJ concluded that the plaintiff's medically-determinable impairment could reasonably be expected to produce the alleged symptoms, but not of the intensity reported by the plaintiff. (R:19)

The ALJ rejected Dr. Meiri's opinion the plaintiff could only lift or carry 10 pounds, and could walk, stand and sit for a total of 2 hours, at most, per workday. The ALJ found that this opinion was not supported by medically accepted diagnostic and clinical techniques, and was inconsistent with other substantial

12

evidence in the record. (Id.) Instead, the ALJ gave significant weight to the opinions of the non-examining agency physicians, who based their opinions on the medical records, and provided specific reference to those records in reaching their determinations. These opinions were not inconsistent with medical records subsequently added to the file. Accordingly, the ALJ found that the plaintiff could perform the full range of light work. (R:19-20)

Finally, the ALJ considered whether the plaintiff retained the residual functional capacity to perform to her past relevant work. Based on the functional demands of her past employment as an insurance sales agent, as defined in the Dictionary of Occupational Titles, the ALJ concluded that the plaintiff was able to return to the types of work she performed in the past. Accordingly, she was not under a disability as defined in the Social Security Act.

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The plaintiff's motion for summary judgment contends that the ALJ should have found the plaintiff's radiculopathy of the right leg to be a severe impairment, and should have given controlling weight to Dr. Meiri's assessment of the plaintiff's residual functional capacity. The defendant's motion for summary judgment asserts that the decison is supported by substantial evidence on the record, and that the ALJ applied the correct legal standards.

## V. RECOMMENDATIONS OF LAW

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Richardson, supra.

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 CFR § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence

to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

A.        Dr. Meiri's Assessment

The plaintiff contends that the ALJ should have accorded controlling weight to Dr. Meiri's assessment of the plaintiff's residual functional capacity, and his conclusions about the extent of her disability. Dr. Meiri was the plaintiff's treating physician through the entire period covered by the administrative record.

The opinion of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 CFR §§ 404.157(d)(2), 416.927(d)(2)(1999). This Circuit has held

that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records. <u>Lewis</u>, 125 F.3d at 440; <u>Jones v. Department of Health & Human Services</u>, 941 F.2d 1529, 1532-3 (11th Cir. 1991); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991).

Dr. Meiri stated that the plaintiff was unable to work owing to chronic right hip pain, neuropathy in the lower right extremity, and a herniated disc at L4-L5. However, Dr. Meiri was the oncologist who managed the plaintiff's chemotherapy and radiation therapy after her surgeries. Dr. Meiri did not diagnose or treat any of the symptoms forming the basis of these physical limitations in the residual functional analysis. Indeed, when the plaintiff mentioned these symptoms during her May 2005 visit with Dr. Meiri, the doctor suggested that the pain was the result of the plaintiff's history of extensive exercise programs and golfing. The plaintiff was told to seek treatment from her general physician, Dr. Wolpe. In August 2005, Dr. Meiri's notes state "no joint pain, back pain or weakness." There is no mention of hip pain on January 5, 2006. But in June 2006, Dr. Meiri opined that the plaintiff was unable to work owing to back, hip and right leg pain. Dr. Meiri's assessment also noted that the plaintiff suffered from severe

chronic fatigue, but did not complete the section asking how this would affect her ability to work. Accordingly, Dr. Meiri's opinion is not supported by her treatment notes and diagnostic tests.

The rest of the medical record does not support Dr. Meiri's assessment. Dr. Wolpe treated conservatively the plaintiff's June 2005 complaint of knee pain from a golfing slip. At the time, Dr. Wolpe noted that the plaintiff was teaching water aerobics as well as playing golf. In October 2005, the plaintiff complained of back pain. Dr. Wolpe did not prescribe medication, but prescribed a course of physical therapy, which the plaintiff did not complete. The residual functional capacity assessments completed by the agency physician were based entirely on the medical records, tests and diagnoses, which did not materially change in content in the medical records submitted after those assessments were completed. In appropriate circumstances, the opinions of agency physicians based on the medical records may be entitled to greater weight than the opinions of the treating physicians. See SSR 96-6P.

Accordingly, good cause exists for the ALJ to refuse to accept Dr. Meiri's assessment and to give significant weight to the assessments made by the agency physicians. The ALJ clearly articulated his reasons for reaching this result. Thus his findings with regard to Dr. Meiri's opinion are based on substantial evidence and a correct application of the law.

B.    Radiculopathy

The plaintiff asserts that the ALJ incorrectly failed to consider the plaintiff's lower right extremity radiculopathy as a severe impairment. This condition is diagnosed by the August 2004 nerve conduction tests, in the observed antalgic gait, difficulty squatting and negotiating stairs, difficulty in walking community distances, and in the plaintiff's testimony of constant numbness in her toes. The plaintiff contends that these have more than a minimal effect on her ability to do basic work-related activities, and thus constitute a severe impairment which should have been evaluated. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).

The defendant points out that it is the effect on work-related activities, rather than the diagnosis which determines whether a condition is a severe impairment. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). SSR96-3p. The nerve conduction tests showed moderate right radiculopathy. The plaintiff did not seek treatment for this condition and did not take any medication for it. She continued to play golf and teach water aerobics. She failed to complete the course of physical therapy to improve her hip pain, gait and walking.

The ALJ rejected, as not entirely credible, the plaintiff's testimony that her back, hip and leg pain limited her ability to perform work-related activities. He found the testimony

18

to be inconsistent with the medical record, with the plaintiff's daily activities, with her failure to seek treatment for that pain, with her failure to complete her physical therapy course, and with her lack of medication for the pain.

There is substantial evidence in the record to support the ALJ's finding that the plaintiff's radiculopathy did not affect her ability to do work-related activities sufficiently to be considered a severe impairment.

C.    Ability to Perform Past Relevant Work

The defendant asserts that in light of all of the evidence in the record, the ALJ properly determined that the plaintiff had the ability to perform the full range of light work, and thus was able to perform her past work as an insurance sales agent. 20 C.F.R. § 404.1545. The plaintiff contends that this result is only possible if the opinion of Dr. Meiri, the treating physician, is incorrectly rejected, and the opinions of non-examining agency physicians are accepted.

As discussed above, substantial evidence and a correct application of the law support the ALJ's decision to not accept Dr. Meiri's opinion, and to rely instead on the assessments of the agency physicians, the medical record, and the plaintiff's activities of daily living. Accordingly, the decision of the ALJ should be affirmed.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that the Plaintiff's Motion for Summary Judgment (Docket Entry 8) be DENIED, and the Defendant's Motion for Summary Judgment (Docket Entry 14) be GRANTED.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, for consideration by The Honorable William J. Zloch, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 26th day of June, 2008.

*Lurana S. Snow*
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:
Lilli W. Marder, Esq. (P)
AUSA Ann Peter-Griffin (D)